# SOCIETY OF THE HELPERS OF THE HOLY SOULS v. ERNEST LAW et al., Appellants.

### In Banc, May 15, 1916.

1. **RELIGIOUS CORPORATION: Not to Hold Title, Etc.** Neither the Legislature nor the courts can establish a religious corporation except its charter shows that it is created only to hold title to real estate for church edifices, parsonages and cemeteries; and a corporation organized for purposes other than those alone is not a religious corporation within the meaning of the Missouri Constitution.

   *Held,* by GRAVES, J., dissenting, that if the circuit court in entering a *pro forma* decree attempted to and did organize a religious corporation, its act was futile, and the chartered company has no standing in a court to recover real estate devised to it; and to determine whether it is a religious corporation resort should be made, first, to its charter, and if that is ambiguous or uncertain in meaning, then, to extraneous proof.

2. ———: **Valid Benevolent Corporation.** *Held,* under the facts stated in the opinion, that the plaintiff is not a religious corporation, but is a valid benevolent corporation under the statutes of Missouri. And that the fact that, in addition to the primary purposes and objects of practical benevolence set forth in its charter, it had the incidental right to impart religious instruction did not prevent this suit for property devised to it, since this particular franchise could only be attacked in a direct suit by the State.

   *Held,* by GRAVES, J., dissenting, that a corporation whose charter recites that "the purpose and object of said corporation shall be to maintain the establishment now under our charge in said city known as 'The Society of the Helpers of Holy Souls' and also others that we may hereafter establish; and in connection with same, to gratuitously visit the sick poor daily, irrespective of creed or color, rendering them every assistance in our power by nursing them in their homes; to organize our convent, meetings and sewing classes for the working class and poor children and impart religious instruction to same," etc., and which "is composed, exclusively, of members of the religious order of

the Roman Catholic Church known as "The Helpers of the Holy Souls in Purgatory,'" the purpose of said "religious order" being an exemplification of the tenets and doctrines of the church concerning souls in Purgatory, is a religious corporation, and cannot be held to be a mere benevolent association.

3. ———: **Devise to Unincorporated Society.** There is no principle of law which forbids a charitable gift to an unincorporated religious body or any of its orders. Even if an attempted incorporation must be held to be a religious corporation and a devise to it of real estate for that reason be invalid, yet if the unmistakable devise is to a known unincorporated society which has the same name as that of the attempted incorporation, it will be upheld, and the property can be recovered by the society's trustees.

Appeal from St. Louis City Circuit Court.—*Hon. George C. Hitchcock,* Judge.

AFFIRMED.

*James L. Minnis, Goodbar & Tittmann, Claude Hardwicke* and *Busby & Withers* for appellants.

(1)   The court erred in finding or holding that the plaintiff corporation was organized, incorporated and existed for benevolent and charitable purposes, and not for religious purposes. It is a religious corporation. Sec. 8, art. 2, Const. 1875; Sec. 3432, R. S. 1909 (Sec. 1394, R. S. 1899); Proctor v. Board of Trustees, 225 Mo. 56; Klix v. St. Stanislaus Parish, 137 Mo. App. 355; In re St. Louis Institute of Christian Science, 27 Mo. App. 633; Catholic Church v. Tobbein, 82 Mo. 423; Lilly v. Tobbein, 103 Mo. 477; State ex rel. v. Board, 175 Mo. 56; Kenrick v. Cole, Exr., 61 Mo. 577; Boyce v. Christian, 69 Mo. 492; Schmucker's Estate v. Reel, 61 Mo. 601; Atty.-Gen.

v. St. Cross Hospital, 17 Beavan's Reports (Eng. Chancery), 465; Pack v. Shanklin, 27 S. E. (W. Va.) 393; St. Peter's Roman Catholic Congregation v. Germain, 104 Ill. 440. (2) The court erred in divesting the legal title to the real estate out of the heirs of the deceased and vesting it in the plaintiff. The attempted devise to the plaintiff, a religious corporation, was void, and did not and could not vest in the plaintiff. Secs. 7, 8, art. 2, Constitution 1875; Proctor v. Board of Trustees, 225 Mo. 56; In re McGraw, 111 N. Y. 66, 2 L. R. A. 387; Decamp v. Dobbins, 31 N. J. Eq. 690; Trustees v. Hilken, 84 Md. 170; Kennett v. Kidd, 87 Kan. 652, 44 L. R. A. (N. S.) 544; U. S. v. Utah, 15 Pac. 473; Hansher v. Hansher, 8 L. R. A. 558; 3 Ency. of Ev., p. 635. (3) The heirs of Mrs. Bailey may contest the right of plaintiff to take the devise. They do not attack the corporate existence of plaintiff, or ask a forfeiture of its charter, but simply contend that as the plaintiff was legally incapable of taking and holding the property, the attempted devise was void, never took effect, and the property descended to the heirs. Proctor v. Board of Trustees, 225 Mo. 56; 2 Underhill on Wills, sec. 841.

*J. L. Hornsby* for respondent.

(1) Defendant's charge that plaintiff is a religious corporation, constitutes an attack on the validity of plaintiff's incorporation, for the reason that in this State no religious corporation can be created except for the purpose only of holding the title to such real estate as may be prescribed by law for church edifices, parsonages and cemeteries. Constitution 1875, art. 2, sec. 8. And if plaintiff's corporate organization was an attempt to create a religious corporation, it not being for any of purposes provided in the Constitution, the incorporation was void, and plaintiff has no corporate existence. Atty.-Genl. v.

Lorman, 59 Mich. 157; Thompson on Corporations, sec. 171; Note to People v. Water Co., 33 Am. St. 178. The validity of plaintiff's incorporation cannot be questioned by defendants, but only by the State in direct proceedings. St. Louis v. Shields, 62 Mo. 252; Catholic Church v. Tobbein, 82 Mo. 418-424; Church Soc. v. Branch, 120 Mo. 243. (2) Plaintiff is not a religious corporation. The character of a corporation is to be determined by the objects of its creation and its purposes as expressed in its charter. State ex rel. v. Westminster College, 175 Mo. 53-58; Sherer v. Mendenhall, 23 Minn. 93; Oregon Ry. Co. v. Oregonian Ry. Co., 130 U. S. 1; Atty.-Genl. v. Lorman, 59 Mich. 157; Hamsher v. Hamsher, 8 L. R. A. 556. The primary objects of a corporation control its character. State ex rel. v. Westminster, 175 Mo. 52; Colonization Society v. Hennessy, 11 Mo. App. 555; In re Institute of Christian Science, 27 Mo. App. 638. A corporation cannot, by its articles of association, obtain greater powers than the Constitution or statutes permit. If a lawful purpose is specified, but the articles also assume for the corporation the existence of a power which it is not permitted to exercise, then this additional and unauthorized assumption may be treated as surplusage and the corporation treated as entitled to exercise the lawful powers only. Oregon Ry. Co. v. Oregonian Ry. Co., 130 U. S. 1; Hamsher v. Hamsher, 8 L. R. A. 558; Eastern P. R. Co. v. Vaughn, 14 N. Y. 546; Beckett v. Uniontown Assn., 88 Pa. St. 211; 1 Thompson, Corporations (2 Ed.), p. 182; Lighting Co. v. Massey, 56 S. W. 35. The fact that the persons constituting plaintiff corporation are members of a religious order in the church does not constitute a corporation which they organize a religious corporation. Colonization Society v. Hennessy, 11 Mo. App. 555; State ex rel. v. Westminster College, 175 Mo. 53; Franta v. Bohemian Union, 164 Mo. 304.

I.

BOND, J.—Seven out of seventeen members of a religious order in the Roman Catholic Church, re- siding in St. Louis, were incorporated under the stat- utes providing for the formation of benevolent, reli- gious, scientific, fraternal, beneficial and educational corporations by a decree of the circuit court of that city on the nineteenth of October, 1905.

Mrs. Anna Hamilton Bailey, who died the twenty- first of September, 1910 (without any descendants), devised, among a large number of other charities, a lot of ground fifty feet wide on Randolph street to ''The Order of the Little Helpers.'' Plaintiff took possession of this lot and brought the present action against the next of kin of the said testatrix, stating in the petition that the term ''Little Helpers'' was the name by which the plaintiff was known in St. Louis, and praying a decree vesting title to the lot in the plaintiff corporation.

The answer of defendant, as far as material, averred that plaintiff was organized as a religious corporation in violation of the Constitution of Mis- souri, article 2, section 8, to-wit:

''Religious corporation may be established for one purpose only. That no religious corporation can be established in this State, except such as may be cre- ated under a general law for the purpose only of holding the title to such real estate as may be pre- scribed by law for church edifices, parsonages and cemeteries.''

That plaintiff could not take the real estate de- vised, and also that the terms of the devise were too uncertain to give it effect, and prayed the court to ad- judge defendant as next of kin to be entitled to the property.

The case was submitted to the court upon an agreed statement of facts (subject to objections as to materiality and relevancy of the evidence), which disclosed in substance that the plaintiff corporation was known in St. Louis as "The Little Helpers;" the terms and devises of Mrs. Bailey's will and that she meant and intended by clause 7 thereof to give to the plaintiff corporation the lot described in the petition and that plaintiff was in possession of it. The remaining clauses of the agreed statement were introduced by defendants (plaintiffs objecting to their materiality) and disclosed the kinship of the defendants to Mrs. Bailey; the doctrine of the Roman Catholic Church as to purgatory; that the reason for the adoption by its founders of the name: "The Society of the Helpers of the Holy Souls in Purgatory," was that said Society performed good works, offered prayers to shorten the suffering of the souls in purgatory "and hasten their entrance into heaven." That the Society was organized in France about 1854, and has branches extending throughout the civilized world, including the one established in St. Louis in 1903; that their "main object is, by spiritual and corporeal works of mercy" done for no remuneration whatever and for religious charity, to relieve and deliver the souls in purgatory; that all of the *seventeen* members are engaged in works of charity, especially in nursing the sick poor in their own homes and by such visits alleviating bodily misery and giving spiritual assistance and aid; that the sisters organize meetings for the working class and poor children who then receive familiar instruction, and young women employed during the week in business hours, find protection, amusements and friendly assistance at the convent and have the benefit of a free circulating library. That on July 21, 1905, certain members of said society (the Society of the Helpers of the Holy Souls in Purgatory) filed in the circuit court of the city of

St. Louis a petition, constitution and articles of agreement for a *pro forma* decree of incorporation under the provisions of article 11, chapter 12, of the Revised Statutes of Missouri of 1899, and thereafter on October 19, 1905, a decree was entered purporting to incorporate the plaintiff by the name of "The Society of the Helpers of the Holy Souls."

The agreed statement of facts then recites that a pamphlet attached, entitled "Helpers of the Holy Souls in Purgatory," was published by plaintiff and contained true statements of the objects and duties of that society and that the same are also disclosed in an article by Mrs. Morrison, which also correctly gives information, data and statistics of that society in St. Louis. The constitution and articles of agreement of the plaintiff, the decrees of incorporation, were read in evidence, article 3 of which is as follows, to-wit:

"Article (3): The purpose and object of said corporation shall be to maintain the establishment now under our charge in said city of St. Louis, known as 'The Society of the Helpers of the Holy Souls,' and also others that we may hereafter establish in said city or in the State of Missouri, and in connection with same, to gratuitously visit the sick poor daily, irrespective of creed or color, rendering them every assistance in our power by nursing them in their own homes; to organize in our convent, meetings and sewing classes for the working class and poor children and impart religious instruction to same, and assist said classes and children as best we can; to maintain a free circulating library and perform various other gratuitous works of charity and benevolence."

The trial court rendered a judgment for plaintiff, from which defendant duly appealed.

267 Mo. 43

## II.

The plaintiff in this case is not a "religious corporation" in the constitutional sense of those terms (Constitution 1875, art. 2, sec. 8, and art. 10. sec 21);

Religious Corporation.

for neither the Legislature nor the courts can establish a religious corporation except its charter shall show that it is created only to hold title to real estate for church edifices, parsonages and cemeteries. Any other form of "religious incorporation" is a nullity on its face. Hence if the persons who organized the plaintiff corporation designed in so doing to create a "religious corporation," their purpose was not effectuated for the reason that their articles of association or charter do not show that the corporation in question was established "for the purpose only" of taking title to the property specified in the constitution.

The only inquiry, therefore, is not as to its character as a "religious corporation," but whether or no the plaintiff was validly incorporated for "benevolent, scientific or educational purposes." [State ex rel. v. Lesueur, 99 Mo. l. c. 558; R. S. 1899, sec. 1397, now R. S. 1909, sec. 3435.] The determination of this question is decisive of the rights of the parties. The statute regulating this subject, so far as it pertains to the formation of corporations for benevolent purposes, is, to-wit:

"Sec. 3435. *What Associations May Be Incorporated.* Any association formed for benevolent purposes, including any purely charitable society . . . or any association whose object is to promote temperance or other virtue conducive to the well-being of the community and, generally, any association formed to provide for some good in the order of benevolence, that is useful to the public, may become a body corporate and politic under this article; . . . and in general, any association, society, com-

pany or organization which tends to the public advantage in relation to any or several of the objects above enumerated, or whatever is incident to such objects, may be created a body corporate and politic by complying with sections 3432 and 3433. [R. S. 1899, sec. 1397.]''

The corporate powers and purposes of the plaintiff hereinbefore set out are, in brief: the maintenance of the society denoted by the corporate name of the plaintiff in St. Louis and Missouri, and in connection with same (a) ''to gratuitously visit the sick poor daily, irrespective of creed or color, rendering them every assistance in our power by nursing them in their homes;'' (b) ''to organize in our convent meetings and sewing classes for the working class and the poor children and impart religious instruction to same, and assist said classes and children as best we can;'' (c) ''to maintain a free circulating library and perform certain other gratuitous works of charity and benevolence.''

Taking the foregoing alphabetical subdivisions in order, by the first the plaintiff corporation was empowered to maintain an organized society of the same name and in cooperation with it (for that is the meaning of the terms ''in connection with same'') to gratuitously visit the sick poor daily, etc., as indicated in the language of subdivision ''a''; and in the same way to do the things specified under the subdivisions marked ''b'' and ''c,'' with no other reward for any of such acts or deeds than the sense of having done good to others in need, regardless of their faith or race. These specific duties imposed by its charter on the members of the plaintiff corporation are of the essence of practical benevolence. This is indisputable, nor do we conceive this to be gainsaid by counsel for appellant. We gather that their attack upon the charter of the plaintiff is directed, first, to the clause empowering it to maintain an unorganized society in

St. Louis or elsewhere. The answer to this objection is twofold: first, there is no principle of law which forbids a charitable gift to an *unincorporated* religious body or any of its orders, whether it be Protestant or Catholic; second, the fair intendment and signification of the language referring to the maintenance of the religious order to which the incorporators of the plaintiff belong is, that it was to be done in the manner and mode set forth in the remaining clauses of the charter. Now acts of that sort are benevolences, pure and simple, and it could not be held that a charter authorizing them, transcends the power granted by statute to any citizens of whatever church or faith to organize themselves into a body politic for benevolent purposes.

The second objection of appellant relates to the expression under subdivision "b" of the powers given to the plaintiff to provide meetings and sewing classes for the working class and poor children *and impart religious instruction to same,* etc., it being claimed that these underlined words embraced a power which could not have been included in the charter. If, as is inferable from the agreed facts, these underlined terms, considered apart, implied the inculcation of a particular faith by teaching its tenets, then they are not an object for which *a legal* corporation may be exclusively formed under the Constitution of this State, and if the present corporation had been chartered for that purpose alone, or is carried on only for that object, then its franchise would be a nullity or subject to revocation at the suit of the State. [St. Louis v. Shields, 62 Mo. l. c. 252; Haskell v. Worthington, 94 Mo. l. c. 569; Black v. Early, 208 Mo. l. c. 303; Klix v. St. Stanislaus Parish, 137 Mo. App. l. c. 357.] But an inspection and analysis of the powers granted in plaintiff's charter do not sustain the position that it was only created to teach and propogate the Roman Catholic religion, nor that this has been

its only employment. The specific powers and active duties prescribed in the charter of plaintiff, as has been shown, provide for the doing *daily* of many acts of diverse nature in helping the helpless and alleviating the sufferings that come from human poverty and want, purely from motives of charity and the sense of duty on the part of the doers of these acts. It is to such services that the corporation seems to have devoted its practical efforts. The fact that another expression in the charter authorizes occasional religious instruction, might in a direct attack by the State afford ground for the annulment or withdrawal of that particular franchise (State ex inf. v. Trust Co., 144 Mo. 562; State ex rel. v. Gas & Oil Co., 153 Ind. 483; State ex rel. v. Railroad, 47 Ohio St. 130; State ex rel. v. Standard Oil Co., 49 Ohio St. 137; Yore v. Superior Court, 108 Cal. 431; State ex rel. v. Topeka, 30 Kan. 653; Commonwealth v. Canal Co., 43 Pa. St. l. c. 301); but it affords no basis in the present action for a judgment, that a charter giving to the corporators many other diverse powers wholly benevolent and strictly within the purview of the law providing for corporations of that nature, should be abrogated or annulled in a suit by the corporation for the enforcement of its property rights against third parties. The record shows that it is admitted that it was the intention of the testatrix in this case to give this little lot of ground to these human helpers engaged in daily work of practical help for the helpless of whatever race or religion *"which tends to the public advantage"* and is done *"for benevolent purposes,"* and is consequently embraced within the very words of the statute on this subject. And if it be that these acts are believed by the doers to be vicariously helpful to souls in purgatory, such a belief does not alter or transform the actual character or nature of the acts themselves, nor deprive them of their essential qualities of unselfish and unpaid kind-

nesses and assistances to the poor and needy, and hence in the truest sense to be deemed acts of practical benevolence. With the particular faith or prayers of these charity workers the law is not concerned. In such instances the law gives the fullest freedom of conscience. But it does commend their works and deeds and will grant them authority to visit the sick, the poor and the needy and to relieve their sufferings, and does not inquire if these good deeds are done with the expectation, hope, faith and prayer that their performance will avail the repose of the dead. In other words, the peculiar religion of the actors cannot alter the benevolence of their work and it is but a corollary to this: that the fact that all of the corporators are members of a particular church does not affect their right to incorporate for a statutory object. [Franta v. Bohemian Rom. Cath. Cent. Union, 164 Mo. l. c. 313; State ex rel. v. Board of Trustees, 175 Mo. 52; St. Louis Colonization Assn. v. Hennessy, 11 Mo. App. l. c. 558.]

## III.

Appellant relies upon the case of Proctor v. Board of Trustees, 225 Mo. 51. In that case there was a devise *eo nomine* to a religious corporation chartered in Tennessee, to hold in trust property for the Methodist Episcopal Church, South. By the terms of the devise the Tennessee corporation was to control the property for the use of the Scarritt Bible and Training School, a Missouri corporation. It was ruled that both these corporations fell under the ban of the Constitution of this State (Art. 3, sec. 8) and that the Tennessee corporation, the devisee, was not saved by the doctrine of comity, because the observance of that rule would never be carried to the extent of contravening the public policy of this State by giving to foreign

*Other Decisions.*

corporations any advantage over a similar domestic corporation, and that neither of the corporations could take the devise made to them in their corporate name. In arriving at its conclusions the court considered the charters of the two corporations and concluded therefrom that their "primary object and purpose of organization was for religious purposes." In fact, they seem to have had no other    (Id. pp. 63, 67).

The charter in the instant case discloses "that the primary purpose and object" of the plaintiff corporation are the *daily* duties of its members to visit and assist the sick poor "irrespective of creed or color," while the imparting of religious instruction is only mentioned as incidental to the occasional meetings of sewing classes and poor children. The present charter is not one void under the Constitution as having been granted only to teach a particular religion, but is one that is valid in so far as it authorizes deeds approved as benevolent by secular as well as Christian standards. Hence, the point ruled in the Proctor case has no bearing on the different charter shown in the present record.

Appellant also relies on the case of Fishing Club v. Kessler, 252 Mo. 424. Nothing ruled in that case bears upon the constitutional validity of the charter presented in the present record. In that case the charter of the plaintiff corporation was assumed to be valid, but it was ruled that the plaintiff corporation could not compel its president to turn over an investment in four hundred and twenty-six acres of land which he had fraudulently taken in his own name while acting on behalf of the plaintiff and which he sought to sell to the corporation at an advance of six dollars per acre, the theory being that the corporation in question was not authorized to acquire that sort of property. Obviously that ruling throws no light on the question of the validity of the plaintiff corpora-

tion in the present case, under the statute providing for the corporations for benevolent purposes; for if the present plaintiff was lawfully established under that statute, it would be entitled to take the devise in accordance with Mrs. Bailey's will and apply it or its proceeds to the benevolent purposes specified in its charter.

## IV.

If the plaintiff was not (which it is) a benevolent corporation, but was an abortive effort to create a religious corporation and, therefore, claiming to act under a charter void on account of the prohibition of the Constitution, yet the result would equally defeat the purpose of the defendants to obtain the title to the lot in controversy. This, for the reason, that the langauge of the will of Mrs. Bailey as to this devise is, viz.:

Devise to Unincorporated Religious Society.

"Seventh: ,I give and bequeath to the order of the 'Little Helpers' my lot in the city of St. Louis, State of Missouri, on the north side of Randolph Street, fronting fifty feet on Randolph Street," etc.

And the attempted incorporation of plaintiff did not destroy the independent and continued existence of "The Order of Little Helpers" whose name as a religious society was used as the corporate name of plaintiff. This proposition was established in the case of Catholic Church v. Tobbein, 82 Mo. l. c. 424, where the facts were that Tobbein devised one-half of his estate to the Catholic church at Lexington, Missouri, whereupon that church incorporated itself by that name and brought suit for the probate of the will and obtained judgment below, which was reversed on appeal. Said this court: "The Catholic church at Lexington did not lose its existence or organization in the incorporation of the plaintiff by the same name."

This court then quoted the constitutional provision and held that the plaintiff corporation could not take the property, but added, whether the Catholic church at Lexington as distinguished from the corporation of that name can receive and hold property "can be determined only in a suit instituted by that church." Upon this hint a new suit was brought by the unincorporated body, and, after demurrer, its petition was amended by the substitution of certain members of the church as plaintiffs, from which an appeal was again taken to this court (Lilly v. Tobbein, 103 Mo. 1. c. 483), where BLACK, J., held that the church did not lose its existence by its attempted incorporation and that its suit could well be maintained by some of its individual members suing on behalf of themselves and of others, and, as to the rights of the church to recover the devise, added: "But it is well settled law that a charitable devise or bequest will be upheld and enforced, though it is made to a voluntary, unincorporated association," citing Schmidt v. Hess, 60 Mo. 591; 2 Perry on Trusts (3 Ed.), sec. 730.

Now clause 4 of the agreed statement of facts is to-wit:

"(4) The name 'The Little Helpers' is not the name of any corporation, nor of any order or society, and is only the name by which plaintiff and the members of the society of the Helpers of the Holy Souls in Purgatory are commonly known and designated in the City of St. Louis."

This language and that contained in clause 7 of the will, make it certain to a common intent that the testatrix devised this lot either to an order *unincorporated,* or to the plaintiff, since both are known in St. Louis by the name "The Little Helpers." It necessarily follows under the equitable principle which conserves a charitable devise, that the one made

by Mrs. Bailey became effective either in the unincorporated society denoted by the terms "Little Helpers" or in the incorporated society equally denoted by the same terms, and if therefore the plaintiff corporation had been held by us to be void under the Constitution, we would have been compelled to hold, further, that the devise in question was valid as to the unincorporated society of the same name. And we would have taken the course in the two cases last cited and would have sent the case back, in order that the individual members of the unincorporated order, on their own behalf and on behalf of all others, might assert its title to the devise, based on the terms of the will giving the lot to a name "Little Helpers," which term designated both the incorporated and the unincorporated order; the one composed of seven members and the other having seventeen. In case of such new suit the unincorporated body would not be prejudiced by any agreements made in this case to which it is not a party.

It follows that the defendants can have no interest in the little lot alleged in their briefs to be assessed at $3500. Other clauses of the will of Mrs. Bailey devised real estate of great value to the Episcopal, Protestant and Catholic charities, and included specific bequests of money and stock to different personal friends, not omitting a thousand dollars given to a faithful colored servant. The names of the defendants in this suit are excluded from any mention in any of the clauses of her will, all of which bears internal evidence of just discrimination and impartiality in the selection of the objects of her bounty. The competency of the testatrix to execute the instrument is incontrovertible. The terms of the gift preclude the possibility of its failure, for one of the two devisees by a common name must take as *against* the defendants.

The judgment in this case is affirmed.

PER CURIAM.—The foregoing opinion of BOND, J., in Division, is adopted by the Court in Banc. All concur except *Graves, J.,* who dissents in separate opinion; *Blair, J.,* not sitting.

GRAVES, J. (dissenting).—I cannot concur in the majority views in this case, and the question involved being one of more than passing interest I feel .that my reasons for dissenting should be assigned.

Able counsel for respondent, with commendable frankness (in oral argument), said that if **Religious Corporation.** the "Society of the Helpers of the Holy Souls" was in fact an attempted religious corporation, then the judgment *nisi* was wrong. In different language the matter may be thus expressed: If the circuit court in entering the *pro forma* decree attempted to and did organize a religious corporation, when it chartered the respondent, then the act of such court was futile in view of constitutional inhibitions, and respondent has no standing in this case.

To determine the character of a corporation we should go to its charter first. If, however, the language used in the charter is ambiguous and uncertain of meaning, I know of no rule of law which would preclude a court in construing such ambiguous written instrument, from invoking the assistance of extraneous proof in reaching the meaning of the instrument. Nor should we in determining the character of the charter emphasize one portion thereof to the exclusion of other portions. The charter should be read and construed from its four corners. Its real purpose can only be gathered in that way. My learned brother has omitted some of the matters in. this charter, which to my mind tend to characterize the corporation, and has emphasized minor matters in discussing the enumerated powers in section three of the charter, and omitted a discussion of the first. prin-

cipal object of the corporation, as in said section 3, stated.

The very first object and purpose of this corporation, as expressed in article 3 of its charter is to *maintain* "the Society of the Helpers of the Holy Souls" in St. Louis, and other similar societies to be thereafter organized in the city of St. Louis and the State. The language of the charter in this respect is:

"*The purpose and object of said corporation shall be to maintain the establishment now under our charge in said city of St. Louis known as 'the Society of the Helpers of the Holy Souls,' and also others that we may hereafter establish in said city or in the State of Missouri.*"

This article cannot be read in full without reaching the conclusion that the maintenance of these societies in the city and the State is the prime object and purpose of the corporation. All other things are, by the very words of the article, made subsidiary thereto. Note the language just following the quotation, supra:

"*And in connection with same,* to gratuitously visit the sick poor daily, irrespectively of creed or color, rendering them every assistance in our power by nursing them in their homes; to organize in our Convent, meetings and sewing classes for the working class and poor children and impart religious instruction to same, and assist said classes and children as best we can; to maintain a free circulating library and perform various other gratuitous works of charity and benevolence."

There is much significance in the words "*and in connection with same*" as used here. The use of this clause, as it is used, points unerringly to the fact that the prime purpose of the corporation is to maintain these societies, and the other matters mentioned in said article 3, including the imparting of

religious instruction to poor children, are but incidents to the main purpose. It is well, however, to note that even these incidental matters authorize the corporation to give religious instruction. At this point, however, we do not desire to further elaborate upon this matter. Let us get back to the question, that even by article 3 of the charter the prime purpose and object of this corporation is to foster and maintain these societies in the city of St. Louis and the State. No amount of ingenuity can change the plain reading of this article 3. Said article 3 is very peculiarly worded. It uses the words "purpose and object" in the singular, and not in the plural. Ordinarily the clause of a corporate charter granting the powers and specifying the purposes and objects of the corporation, usually has these words in the plural, but not so here. This corporation had but one "purpose and object" and that purpose was to maintain the society already in St. Louis, and such others of like character as might be thereafter organized either in the city or the State. All other matters mentioned are mere subsidiary acts to this one "purpose and object."

The character of the corporation, whether religious or benevolent, is therefore dependent upon the character of these societies it is chartered to support and maintain. Had the charter said that the "purpose and object" of the corporation was to support and maintain the Catholic Church, the Methodist Church, or the Presbyterian Church, there would be no question as to the character of the corporation. But isn't this charter just as plain when it is read from its four corners?

It is declared in the charter that this society, for the maintenance of which this corporation was chartered (or rather attempted to be chartered), is a religious organization. Note the language from the charter:

"WHEREAS: We, the undersigned *members Professed of a Religious Order of the Roman Catholic Church, known as 'the Society of the Helpers of the Holy Souls,'* and whose Mother House is in Paris, France, 16 Rue de la Baronlilere, do desire to incorporate under the Provisions of article 11, chapter 12, of the Revised Statutes of the State of Missouri, same being an Act for the incorporation of 'Benevolent, Religious, Fraternal, Beneficial, Educational and Miscellaneous Associations,' in order to better perpetuate the usefulness of the Society, we have already for two years successfully conducted in the city of St. Louis, and all others that we may hereafter establish in said city or in the State of Missouri, do hereby by these articles of agreement associate ourselves in writing for said purpose of incorporation."

So, when we take the several portions of this charter, we have (1) this corporation organized for the one "purpose and object" of maintaining societies known and to be known as "The Society of the Helpers of the Holy Souls," and (2) that such societies are religious societies. This much is written in bold English on the face of this charter. From the face of its charter it is clear that there has been a futile attempt to organize a corporation for religious purposes, and this contrary to the Constitution of the State. The judgment of the circuit court granting the *pro forma* decree is void upon its face. Like all other void judgments it can be attacked collaterally in this or any other proceeding.

II. But if it be said that it does not clearly appear from the charter that there was an attempted incorporation of a body for religious purposes, then the ambiguities of the charter may be made plain by extraneous evidence. This was done in this case. The exact character of the societies which the plain-

Religious
Corporation:
Extraneous
Facts.

tiff corporation was chartered to maintain is made
to appear from this record. By an agreed state-
ment of facts certain admissions were made, and
among them were that a little pamphlet published
by the society truly stated its objects, as did also a
published report by Mrs. W. K. Morrison. From
the agreed statement of facts we gather the follow-
ing:

"(1) Plaintiff corporation is composed, exclu-
sively, of members of the religious order of the Roman
Catholic Church known as 'The Helpers of the Holy
Souls in Purgatory.'"

This paragraph of the agreed facts was intro-
duced and read in evidence by the plaintiff (respon-
dent) in this case. They therefore characterize this
society which this corporation was formed to main-
tain, as a "religious order." This is the solemn
agreement made in the court *nisi* and it would be
hard for this court, in the face of this admission, to
say that the society is one for benevolence or charity
and not religion. That it is a most worthy society
there can be no question. That the world is made
better by the teachings and works of those devoted
Sisters, there can be no question. But unfortunately
for them and for us, these are not the questions in-
volved in this lawsuit. The question here is whether
or not there has been a futile attempt to charter a
religious corporation. This plaintiff was chartered
(more correctly speaking attempted to be chartered)
for the one "purpose and object" of maintaining
this society and other similar societies. If then this
society is a religious order, as is admitted in the
agreed facts, then we have a corporation the one
"purpose and object" being to maintain a "religious
order." We use the expression one purpose ad-
visedly, because the charter uses the words "pur-
pose and object" in the singular, thereby clearly
showing that all other things mentioned in the char-

ter, are pure incidents, as will appear more clearly as we reach other admissions in this record.

It will suffice to conclude this paragraph by saying that we have here an attempted corporation for the admitted object and purpose of maintaining a named society, and then we have it admitted in the record that this society is a "religious order." This should be sufficient for a reversal of the judgment *nisi*.

III. In the admissions made in the agreed statement of facts, but introduced by defendants, rather than plaintiff, we have:

Extraneous Proof.

"(7) Purgatory, in accordance with the doctrine of the Roman Catholic Church, is a place or condition of temporal punishment for those who, departing this life in God's grace, are not entirely free from venial faults or have not fully paid the satisfaction due to their transgressions.

"The doctrine of the Catholic Church is that souls in Purgatory are aided by the prayers and works of satisfaction of the living, offered in their behalf.

"The name of the religious societies "The Society of the Helpers of the Holy Souls in Purgatory" was adopted by the founders of this religious society, for the reason that the chief purpose of this society is doing good works and offering prayers as a means of satisfaction as the debt due by the souls in Purgatory on account of their previous wrong doings, and thus to obtain by such prayers and good works, the shortening of the duration of their Purgatorial sufferings and hasten their entrance into Heaven."

We have here the statement of one of the tenets of the Catholic Church, and we refer to it with all due deference. But when we consider this tenet of the

church, we can readily see why the society named in the charter of plaintiff corporation is called therein a "religious order." Its very work is an exemplification of this particular religious tenet. It was organized to teach and amplify this tenet of the church. All other things with this society are but incidents of this main work and purpose. It is the living, moving exemplification of this tenet and teachings of the church, and to my mind it is clearly religious in character. If the society is a religious order, and the main purpose and object of this attempted corporation is to foster and maintain the society, no reasoning can make the corporation other than a religious corporation, or a corporation for religious purposes. The society teaches this tenet of the church, and this corporation is the legal guardian and supporter of the society. But going further into this admitted record. It is admitted in the agreed statement of facts that the paper of Mrs. W. K. Morrison truthfully states the facts. Both the pamphlet circulated by plaintiff, and this paper, shows that the prime purpose of the society is to inculcate this religious tenet of the church. In addition, however, we find that Mrs. Morrison reviews the actual work done and gives the statistics of the society in St. Louis. Among other things reported by her, we find:

"Attendance at conferences and cate-
    chism .............................. 50,862
Children baptized ........................ 22
Adults baptized .......................... 89
Confessions .............................. 580
First communions ........................ 484"

We cannot blind ourselves to the facts shown here. The teaching of the "catechism" is religious teaching, this we must know, or the court knows less than the average individual. Likewise we must know

267 Mo. 44

that baptizing infants and adults, taking confes-
sions and attending to communions are all church
or religious matters. It is therefore apparent that
this society was not only organized to exemplify
the tenet of purgatory as taught by the Catholic
Church, but its actual work is largely along religious
lines.

By the charter, the corporation is made the spon-
sor and supporter of the society. Its purpose is there-
fore religious, rather than benevolent or charitable.
It follows that the action of the circuit court in at-
tempting to charter plaintiff was a void act. Under
the agreed facts in the case it is admitted that the
testator had in mind this corporation, when she made
the bequest. Under these facts the trial court should
have found for defendants, rather than for plain-
tiff. After going through this entire record I have
no doubt that the circuit court made a futile attempt
to incorporate a religious organization for an object
and purpose not permitted by the Constitution, and
to the end that all the facts may appear, I make the
entire agreed statement of facts and the written in-
struments referred to therein a part of this dissent, by
requesting the reporter to attach the same as an ap-
pendix to this opinion. The facts, in unvarnished
hues, will then appear for themselves. The judgment
*nisi* should be reversed, and the cause remanded.

## APPENDIX.

In compliance with the request of GRAVES, J., in
the foregoing opinion, the Agreed Statement of Facts
and the instruments referred to therein are hereto
subjoined.

### AGREED STATEMENT OF FACTS.

"It is hereby stipulated and agreed that the fol-
lowing statement of facts may be offered at the trial

·of this cause and taken by the court as evidence of the facts therein contained, subject, however, to the right of either party, plaintiff or defendant, to object to any statement of fact therein contained on the ground of irrelevancy or immateriality; and subject further to the right of either party, plaintiff or defendant to introduce further testimony or evidence provided that such further testimony or evidence shall not be contradictory to any statement of fact herein agreed upon; and subject further to plaintiff's right to object to the introduction of any evidence by defendants under their answer.

"(1) Plaintiff corporation is composed, exclusively, of members of the religious order of the Roman Catholic Church known as 'The Helpers of the Holy Souls in Purgatory.'

"(2) The said corporation is commonly known in the city of St. Louis as 'The Little Helpers.'

"(3) Anna Hamilton Bailey died in the city of St. Louis on or about the twenty-first day of September, 1910, testate, and seized and possessed, in fee simple, of the following described real estate in said city, to-wit: A lot in City Block 1708, fronting fifty feet on the north side of Randolph street by a depth, northwardly, of equal width between parallel lines of one hundred and twenty feet, two and one-fourth inches to a twenty-foot alley, and being, bounded on the east by a line parallel to and fifty-eight feet east of the east line of Twenty-third street; and that said premises are the same as those described in Clause 7 of the last will of said Anna Hamilton Bailey, as follows: 'My lot in the city of St. Louis, State of Missouri, on the north side of Randolph street, fronting fifty feet on Randolph street, with a depth of one hundred and twenty feet, two and a quarter inches to a twenty-foot alley, being fifty-eight feet east on Twenty-third street, being in City Block 1708.

"(4) The name 'The Little Helpers' is not the name of any corporation, nor of any order or society, and is only the name by which plaintiff and the members of the Society of the Helpers of the Holy Souls in Purgatory are commonly known and designated in the city of St. Louis.

"(5) Anna Hamilton Bailey meant and intended, by her last will and by clause 7 thereof, in naming the order of the Little Helpers as devisee of the real estate in said clause 7 described, to give plaintiff corporation the said parcel of real estate in plaintiff's petition described.

"After the death of Anna Hamilton Bailey, plaintiff took possession of said real estate above described, as devisee thereof under the last will of Anna Hamilton Bailey, deceased, and has continued in possession thereof to the present time.

"(6) Plaintiff admits the truth of the allegations set out in paragraphs three, four, five and six of the second amended answer of defendants, Lawrence K. Kinsey, Ernest Law, Walter A. DeMilly, Augusta Horton Gedney and Arthur L. DeMilly, herein filed.

"(7)  Purgatory, in accordance with the doctrine of the Roman Catholic Church, is a place or condition of temporal punishment for those who, departing this life in God's grace, are not entirely free from venial faults or have not fully paid the satisfaction due to their transgressions.

"The doctrine of the Catholic Church is that souls in Purgatory are aided by the prayers and works of satisfaction of the living, offered in their behalf.

"The name of the religious Society 'The Society of the Helpers of the Holy Souls in Purgatory' was adopted by the founders of this religious society, for the reason that the chief purpose of this society is doing good works and offering prayers as a means of

satisfaction as the debt due by the souls in. Purgatory on account of their previous wrong doings, and thus to obtain, by such prayers and good works, the shortening of the duration of their Purgatorial sufferings and hasten their entrance into Heaven.

"(8) The religious Society of the Helpers of the Holy Souls in Purgatory is a community of religious women which was organized in Paris, France, about the year 1854, and which now has branches or convents in virtually all the civilized countries of the world. The branch or convent of this religious society in the city of St. Louis was established in 1903 by twelve sisters of the order who came here from France at that time, and at present the society here numbers seventeen sisters, their convent being located at 4012 Washington Boulevard, St. Louis. The main object of this community of sisters is the relief and deliverance of the souls in Purgatory by means of spiritual and corporal works of mercy. These works are performed from motives of religious charity and no remuneration, of any kind whatever, is accepted. The society is supported by voluntary offerings, gifts, of benefactors who are interested in the work, and contributions of honorary members. All the seventeen members in this religious community are engaged in works of charity, either at or outside the convent. The sisters are especially active in the nursing of the sick poor, irrespective of creed or nationality, in their own homes. By means of these visits to the homes of the sick and the invalid, the sisters are enabled, not only to alleviate bodily misery, but may assist them spiritually by aiding them to prepare worthily for the sacraments, etc. Both home and abroad, the sisters undertake numerous works of charity which vary according to the needs of the country and the diocese to which they may be called, but all are consecrated to the same aim—the relief and deliverance of the souls in Purgatory. They visit the

sick poor daily, rendering them every assistance in their power and nursing them in their own homes. Out of these visits to the sick and the poor arise many opportunities for doing good.

"In their convents, the sisters organize meetings for the working class and poor children who there receive familiar instruction. Young women employed during the week in business houses find protection, amusements, and friendly assistance at the convent, and have the advantage of a free circulating library.

"One of the works of the Helpers is the preparation of children and adults for the reception of the sacraments and the reception of newly received converts. All the work of the sisters is gratuitous, no other recompense being sought than the consolation of saving the souls of members of the Church and the alleviation of the souls suffering in Purgatory.

"The sisters have the assistance of lay-helpers, Catholic women who aid them in this field of Christian charity, especially on their errands of charity about the city, their visits to poorhouses and hospitals, and in the work of instructing the young in schools, missions, and churches in various parts of the city. These lay-helpers may be enrolled as honorary members. The social side and the recreational features are recognized in the works of the society. Illustrated lectures, musicales, and entertainments are given for the benefit of the children and girls at the meeting in the convent, and for those enrolled in the various sodalities or societies before referred to as 'The Society of the Helpers of the Holy Souls in Purgatory;' that 'The Society of the Holy Souls' mentioned in Article III of said constitution and articles of agreement is the same society hereinbefore mentioned as 'The Society of the Helpers of the Holy Souls in Purgatory;' and at the time of the entering of said decree of incorporation there was not in the city of St. Louis a society known as 'The Society of the

Helpers of the Holy Souls' as distinguished from 'The Society of the Helpers of the Holy Souls in Purgatory' hereinbefore mentioned.

"(10)   It is further agreed that the pamphlet hereto annexed entitled 'Helpers of the Holy Souls in Purgatory' was published by plaintiff and that the statements therein with respect to the object and purposes of the Society of the Helpers of the Holy Souls in Purgatory are true.

"(11)   It is further agreed that the four printed pages hereto annexed, marked 'Exhibit I,' an article written by Mrs. W. K. Morrison, correctly states the object and purposes of the Helpers of the Holy Souls in Purgatory and under the head of 'Information and Data' as amended, correctly states the information there set out in regard to said society; and correctly states under the head of 'Statistics' the items there set out; and correctly states, under 'Division of Works' the facts there set out."

The contents of the pamphlet entitled "Helpers of the Holy Souls in Purgatory" mentioned in article 10 of the above Agreed Statement of Facts, are as follows:

"HELPERS OF THE HOLY SOULS IN PURGA-
TORY.

"The Society of the Helpers of the Holy Souls in Purgatory.

"In a celebrated sermon preached by Bourdaloue, one the 2nd of November, he exclaimed: 'Throughout all time, people have prayed for the dead, but the work of self-sanctification for them was reserved to our generation.' To sanctify themselves, for the souls of Purgatory, is the object that the Religious of the Society of the Helpers of the Holy Souls have in view.

"The Church, ever fruitful, has from time to time raised up many varieties of religious orders to relieve the different miseries of this life; from the

cradle to the grave, she has surrounded her children who suffer with angels of peace and consolation. There only remained for her then to extend this same merciful assistance to the souls of the faithful departed.

"God inspired her to do this at a time when the powers of hell were endeavoring to consign the dead to oblivion by relegating to a distance from the abodes of men the hallowed enclosure where their bodies repose in hope; by often depriving their mortal remains of the priest's blessing; by abolishing the greater number of those pious foundations instituted in their behalf by the piety of our ancestors; by drawing the present generation into a vortex of indifference for spiritual things; of feverish agitation and regard for material interests, which, while it leaves an affectionate remembrance of those who are no more, deprives them of the efficacious help of the prayers and suffrages of those by whom they have been loved. The devil, always hostile to God's glory, undoubtedly knows how much that glory is augmented by each soul that enters into its eternal rest, and his hatred of all who bear our Lord's image, extends even to these chosen souls whose deliverance the Sacred Heart desires so ardently. To protest against this selfish forgetfulness of the dead, many pious associations have been formed, but a religious institution was necessary that would unceasingly raise its voice, in the name of the Church militant, on behalf of the Church, suffering in Purgatory, and be in this unbelieving age, a living witness to our faith in the realities of the other life. This institution was founded by the good pleasure of God; step by step His Divine Providence guided her whom He had chosen to be its Foundress and Mother. Faithful to an inspiration received during a fervent thanksgiving, this soul did not hesitate to undertake the difficult enterprise of making a foundation. She was without resources

and lacked all human help, but neither the trials which established her work on the solid foundation of the Cross, nor her natural repugnance, could 'shake her courage. She had placed all her hope in Providence, and it was by the name of this Divine attribute, the object of her life's devotion, that she .desired to be henceforth known. (See the life of the Reverend Mother Marie ·de la Providence, Foundress of the 'Helpers of the Holy Souls,' by the late Lady G. Ful-. lerton. Burns and Oates, Orchard Street, London.) A virile courage lay hid in that woman's breast; in her bosom beat a noble heart full of compassion and tenderness. It was to her that Pere Olivaint applied these ·words: *'Elle avait une grande ame, et elle. savait vouloir.'*

"Sustained internally by grace, and encouraged externally by the representatives of Divine authority,. and the blessings· with which Providence surrounded her work, she conceived the generous thought of. founding a House whence prayer and expiation should without ceasing, rise to Heaven, in behalf of the suf-fering souls of. Purgatory. The Coure' d'Ars became· for her one of the interpreters of the Divine Will; and, by his counsels and kindly interest, attached himself to this society from its very birth, defining it as 'A thought of love, coming from the Heart of Jesus.' It was not long before the rule of St. Igna-tius, adopted by the rising foundation, conferred on it the benefit of a firm and excellent religious, consoli-dation, and completed the development of a spirit entirely devoted to the interests of our Lord. In fact, the apostolic zeal of the Institution is not confined to the suffering souls of Purgatory. Works of mercy toward the living are òne of the most efficacious means that the Church recommends to her children for helping the dead. Providence did not delay to point. out this way to the Helpers of the Holy Souls,. and. the care of the sick-poor in their own homes was

undertaken. This work furnishes them with opportunities of abnegation and mortification, of which the lives of the saints offer examples innumerable, and consequently enables them to amass treasures of satisfaction for the captive souls, so dear to them; while at the same time it affords the means of bringing back to the practice of religion souls that have long forgotten their duties, and lived deprived of its consolations.

"To stretch out a helping hand by means of this self-devotion at one and the same time to the most forsaken souls in this world and in the next, was the desire of the Holy Foundress, and her daughters strive to realize it. Both at home and abroad they undertake numerous works of zeal and charity, which vary according to the needs of the country and diocese to which they may be called, but all are consecrated to the same end: 'The relief and deliverance of the Holy Souls.'

"They visit the sick poor daily, rendering them every assistance in their power by nursing them in their own homes. Out of these visits to the sick and the poor arise many opportunities for doing good.

"In their Convents the Helpers organize meetings for the working class and poor children, who receive there familiar instruction. Young women, employed during the week, in business houses, find protection, amusement and friendly assistance at the Convent, and have also the advantage of a free circulating library. One of the most cherished works of the Helpers is the preparation of children and adults for the reception of the Sacraments, and the instruction of newly received converts.

"All these works, however, are gratuitous, for these spouses of our Divine Lord seek no other recompense for their labor and fatigue than the consolation of saving the souls of the Church militant,

for the alleviation of the members of the Church suffering.

"An association of expiation ought, above all things, to be an association of prayer, and for this reason, the Society of the 'Helpers of the Holy Souls' attaches great importance to the exercises of interior life, and a great part of each day is devoted to them.

"In addition to the meditations, pious readings, adorations of the Blessed Sacrament obligatory on all, the choir-nuns recite the Office of the Dead. After the example of Blessed Margaret Mary, one of their holy patrons, they have consecrated themselves to a special devotion to the Sacred Heart of our Lord. Every hour they invoke this Sacred Heart, saying the following prayer for the captive souls: 'O My God! we offer for the Holy Souls all the acts of love with which the Sacred Heart of Jesus glorified Thee, during this same hour, when he was upon earth.' The first Friday of every month and the Octave of the Sacred Heart, are observed with special fervor, and the Blessed Sacrament is exposed in the chapel.

"His Holiness the Sovereign Pontiff, Pius IX, honored the Society with two briefs of approbation, and on the 25th of June, 1878, the Religious had the consolation of having their Constitutions approved by his Holiness Leo XIII.

"The Society has now several houses in France, Belgium, England, Italy, America and even China. The Mother house is in Paris, 16 Rue de la Barouilliere.

"But the object of the Helpers is not only to labor themselves for the Holy Souls, but also to diffuse as widely as possible their own spirit and example. With a view, therefore, of augmenting the treasure of merit and satisfaction for the sufferers in purgatory, and of obtaining for them a succession of daily increasing prayers, this Society has added to its ranks Honorary Members, Benefactors, Life-

Members, and Lady Associates, who, upon enrollment enter into a union of prayer and sacrifice with the Helpers, and participate in their privileges.

## "HONORARY MEMBERS.

"The Honorary Members conform, as far as they are able, to the motto of the Society of the Religious Helpers of the Holy Souls in Purgatory: 'Pray, Suffer, Work for the Souls in Purgatory.'

"Pray—They recite every day the acts of Faith, Hope and Charity, with the aspiration, 'My Jesus, Mercy!' for their deceased relatives, applying to them the indulgences attached to these prayers.

"Suffer—They offer their daily sufferings and trials for the same intention.

"Work—Alms-giving, being according to the teaching of Holy Church, one of the most efficacious means of helping the Souls in Purgatory, the Honorary members contribute by a yearly offering (usually in the month of November) of a dollar to the support and good works of the Society exclusively devoted to works of mercy for the deliverance of the Souls in Purgatory.

—"Any one unable to contribute a dollar annually, yet desirous of assisting this great work of charity, can become affiliated by giving any small alms according to his means, and by reciting the same prayers as the Honorary Members.

## "BENEFACTORS AND LIFE MEMBERS.

"Make a more considerable offering, once for all, or at several times, to support the work. Their names are inscribed in a book specially kept for the purpose.

"All these share in the good works and prayers of the Helpers and in the monthly Masses and Communions of Associated Priests and Religions. In the year 1878, when the last calculation was made, 45,600

communions and 17,280 Masses were received into the spiritual treasury of the Order.

"The deceased relatives of Honorary Members participate in the prayers and good works of the Society of the Helpers of the Holy Souls, and special suffrages are applied to deceased Honorary members.

"A Register is kept, wherein are inscribed the names of deceased persons, for whom suffrages are requested by Honorary Members.

### "LADY ASSOCIATES.

"The Lady-Associates take an active and much greater part in the good works of the Helpers. They can be received only after a due probation, and are bound to lead in the world a truly Christian life, by the constant practice of their religious duties and by great fidelity to the duties of their State.

"There are meetings held especially for them every week at the Convent.

"Besides possessing all the advantages of the Honorary Members, the Associates are thus united in a more intimate manner in prayer, in suffering, and in good works, with the Religious Helpers of the Souls in Purgatory, who admit them during life and after death to a participation in all the privileges, merits, and suffrages of their Society.

### "PRIESTS AND RELIGIOUS.

"May become Honorary Members, the former by offering up the Holy Sacrifice once a month, the latter by a monthly Communion according to the intentions of the Society.

### "PROMOTERS OF THE ASSOCIATION.

"The Promoters who form bands of Honorary Members are inscribed as Benefactors, and enjoy the same privileges. Thus to the poor and to the rich, to the good and fervent of every condition of life,

this pious society addresses a note of invitation.  Let us not turn away unheeding while there is one belonging to us numbered among the dead whose love we have not yet forgotten.  Let us listen to the voice that cries to us from those realms of suffering holiness: 'Have pity on me, have pity on me, at least you, my friends!'  How can we better answer its pleading accents, than by entering into a bond of union with the Order of the Helpers of the Holy Souls?  Let us help them with our sympathy.  Let us help them with our prayers.  Let us help them with our alms to enable them to carry on their work of charity.

"Names for Enrollment and Offerings may be sent to the Convent of the Helpers of the Holy Souls in Purgatory, 4012 Washington Boul., St. Louis, Mo.

"PLENARY INDULGENCES.

Granted by

HIS HOLINESS POPE PIUS IX.

To the

Honorary Members of the Society of the Helpers of the Holy Souls.

"To the humble petition presented to the Holy Father, asking a Plenary Indulgence for all the Honorary Members.

"1.  On the day of Enrollment as Honorary Members.

"2.  On November 2, All Soul's Day.  On November 15, Feast of St. Gertrude.  On March 19, Feast of St. Joseph.  On March 25, Feast of the Annunciation of the Blessed Virgin.  On the first Friday after the Octave of Corpus Christi, Feast of the Sacred Heart.  On July 31, Feast of St. Ignatius of Loyola.

"3.  At the hour of death, by pronouncing with a contrite heart, or, at least, breathing interiorly the invocation: My Jesus, Mercy!

"His Holiness deigned to make the following reply:

"'St. Peter's. Rome, July 4, 1860.

"'Receiving favorably the petition which has been addressed to us, We grant, IN PERPETUO, by this present Rescript, and without sending out any Brief, the Indulgences asked for, with the power of applying them by way of suffrage to the Holy Souls in Purgatory.—PIUS IX.'"

The article written by Mrs. W. K. Morrison, for the 1912 conference of the Catholic Charities and Social Activities of the city of St. Louis, marked "Exhibit I" mentioned in Article 11 of the above Agreed Statement of Facts, is as follows:

## "HELPERS OF THE HOLY SOULS IN PURGATORY.

"The Society of the Helpers of the Holy Souls in Purgatory is a community of religious women, established in St. Louis since the month of May, 1903. Their convent, at present, is at 4012 Washington Boulevard.

"The main object of this religious community, which was founded in France about fifty years ago, is the relief and deliverance of the souls in purgatory by means of spiritual and corporal works of mercy. These works are always performed from motives of religious charity, and no remuneration, of any kind whatever, is ever accepted. Neither does the society solicit or collect and here this question arises: How is the work supported? By voluntary offerings, gifts of benefactors who are interested in the work, the contributions of Honorary Members, in fine, Trusting to Divine Providence. From the object of their society its members are called Helpers of the Holy Souls in Purgatory.

"There are at present sixteen members in this religious community, all of them engaged in works of charity either at, or outside the convent.

"It may be stated that these sisters are especially active in one phase of charitable work, which, before their location in St. Louis, had not yet been taken up to any large extent by the members of any other religious community of women. This is the nursing of the sick poor, irrespective of creed or nationality, in their own homes. By means of these visits to the homes of the sick and the invalid, the sisters are enabled not only to alleviate bodily misery, but may even assist them spiritually, by aiding them to prepare worthily for the reception of the sacrament, etc.

"Perhaps the one great purpose and aim of the Helpers of the Holy Souls in Purgatory can be shown in no better way than by quoting from a booklet which has been prepared for the benefit of those interested in their work. We read: 'Both at home and abroad the sisters undertake numerous works of zeal and charity, which vary according to the needs of the country and diocese to which they may be called, but all are consecrated to the same end: The relief and deliverance of the holy souls.'

"They visit the sick poor daily, rendering them every assistance in their power by nursing them in their own homes. Out of these visits to the sick and the poor arise many opportunities for doing good.

"In their convents the Helpers organize meetings for the working class and poor children, who there receive familiar instruction. Young women employed during the week in business houses, find protection, amusement and friendly assistance at the convent, and have also the advantage of a free circulating library. One of the most cherished works of the Helpers is the preparation of children and adults for the reception of the sacraments, and the instruction of newly received converts.

"All these works, however, are gratuitous, for no other recompense is sought than the consolation of saving the souls of members of the Church militant, for the alleviation of members of the Church suffering.

"It will be seen, therefore, that the scope of the religious community is wide. The sisters take this opportunity to plead for a large number of lay-helpers—earnest and devoted Catholic women, who may help them in this broad field of Christian charity. They need such assistance, especially on their errands of charity about town, in their visits to poorhouse and hospitals, and also in the work of instructing the young in schools, missions and churches in various parts of the city. There is here large opportunity for our Catholic women to exercise, in behalf of and together with these religious, the Catholic social and religious Apostolate. In fact, without such help the work of the sisters will, to a large extent, prove ineffective or will, at least, not produce those permanent results which a greater participation of Catholic women in this noble work would bring about. Such lay-helpers, may, if they wish, be enrolled as honorary members.

"The social side and the recreational features are not disregarded in the work of the Helpers of the Holy Souls. Illustrated lectures, musicales and entertainments are given for the benefit of the children and girls attending the meetings at the convent and for those enrolled in the various sodalities. (Not less than fourteen Christmas parties, attended by over five hundred guests, took place in their hall last Christmas.)

"In the summer all the young people, as well as their mothers, are given opportunity to enjoy a day in the country, or at an outing home. A circulating

library has been started with a good collection of religious books and works of fiction.

"One of the more conspicuous works is the Annual Mission, or Retreat, for the benefit of young women employed during the day, which is generally given in the month of October. This Mission gives the sisters opportunity of becoming acquainted with a number of young women who may stand in need of help, and these persons are invited to call at the convent whenever they may be in need of assistance.

"The work of the Helpers of the Holy Souls is not limited to whites, but special classes for instruction and special meetings have been arranged at the convent for the benefit of colored persons. These are well attended, and several conversions have already resulted from the interest shown by the religious in this part of their work.

### INFORMATION AND DATA.

"Name: The Helpers of the Holy Souls in Purgatory.

"Address: 4012 Washington Avenue, St. Louis, Mo.

"In Charge of: The Helpers of the Holy Souls.

"Established: 1903.

"Conducted by: The Helpers of the Holy Souls.

"Purpose: Relief and deliverance of the souls in purgatory by the spiritual and corporal works of Mercy.

"Beneficiaries: Not limited to class, nationality or creed.

"Annual Rent: None—Property, including building, is owned by the religious.

"Sources of maintenance: (a) Donations from benefactors.

"(b) Entertainments and lectures.

"Authorized Public Representative: The Sisterhood of the Helpers of the Holy Souls in Purgatory.

"Salaried Employees Authorized as Collectors or Representatives: None.

"Business Administration: The sisters conduct all business matters, occupying official positions; authorize expenditures, audit accounts and make all payments.

"Employees: Paid employees, giving whole time, none; salaries, none annually. Unpaid assistance, giving part time, ninety-two. Religious, giving whole time, sixteen. Approximate amount of salaries that would be paid for the positions now filled by members of the Order $12,120 annually.

"Annual Report: None published.

"Auxiliary: Ninety-two ladies assist in the works of charity in the Italian sewing schools, the catechism classes and Sunday schools, visits to families of the poor, the hospitals and the quarantine.

STATISTICS.

January 1, 1911, to December 31, 1911.

"Nursing cases ........................... 2,223
Errands of charity and helpful visits..........23,711
Particular instructions given................. 1,641
Attendance at conferences and catechism........50,862
Children baptized........................... 22
Adults baptized............................. 89
Confessions ................................ 580
First communions........................... 484
Books issued............................... 7,573
Garments distributed....................... 5,563

DIVISION OF WORKS.

"AT THE CONVENT.

Sodalities for working-girls and children......Sunday
Sewing for young girls.............................
................Tuesday and Thursday evenings
Sewing for children................................
...........................Saturday afternoon
Sewing for Christian mothers.............Thursday

Sewing for colored mothers......Wednesday evening
Sewing for colored children............Saturday
Material for sewing furnished free.

"IN THE PARISHES.

Annunciation: Catechism—Sunday, Wednesday, Friday.
Visits to families.  Sodality of the Children of Mary.
Nativity: Sunday-school and catechism.  Wednesday.
Visits to families.
St. Paul: Sunday-school.
St. Catherine of Sienna: Sunday-school.
Holy Innocents: Sunday-school.
Our Lady Help of Christians: (Italian Church)
Catechism and sewing for girls...........Saturday
Catechism daily during Lent.
Christian Mothers' meeting..............Thursday
Visits to families.

"VISITING HOSPITALS.

City and Female Hospitals....Wednesday and Friday
City Consumptive Hospital (Quarantine)..Wednesday
Children's Hospital.....................Friday
Skin and Cancer Hospital.................Friday
St. Louis Infirmary (Poor House)......Wednesday."

The Constitution and Articles of Agreement of
the plaintiff herein, together with the *pro forma* decree of the circuit court of the city of St. Louis, Missouri, purporting to incorporate the plaintiff, attached to defendants' answer, and marked "Exhibit
A," mentioned in Article 9 of the above Agreed Statement of Facts, are as follows:

"CONSTITUTION AND ARTICLES OF AGREEMENT OF

"THE SOCIETY OF THE HELPERS OF THE
HOLY SOULS.

"WHEREAS, we the undersigned members Professed of a Religious Order of the Roman Catholic

Church, known as 'The Society of the Helpers of the Holy Souls,' and whose Mother House is in Paris, France, 16 Rue de la Baronillere, do desire to incorporate under the provisions of Article 11, Chapter XII, of the Revised Statutes of the State of Missouri, same being an Act for the incorporation of 'Benevolent, Religious, Fraternal, Beneficial, Educational and Miscellaneous Associations,' in order to better perpetuate the usefulness of the Society, we have already for two years successfully conducted in the city of St. Louis and all others that we may hereafter establish in said city or in the State of Missouri, do here by these articles of agreement associate ourselves in writing, for said purpose of incorporation.

"Article (1): The name and style of said corporation shall be 'The Society of the Helpers of the Holy Souls,' and its main office shall be in the city of St. Louis, Missouri, except that said main office may be removed to any other part of the State of Missouri by a vote of three-fourths of the members of the corporation at any regular or special meeting of the corporation.

"Article (2): The corporate existence of this Society shall be perpetual and shall endure forever, so long as it performs the object for which it is organized.

"Article (3): The purpose and object of said corporation shall be to maintain the establishment now under our charge in said city of St. Louis, known as 'The Society of the Helpers of the Holy Souls,' and also others that we may hereafter establish in said city or in the State of Missouri, and in connection with same, to gratuitously visit the sick poor daily, irrespective of creed or color, rendering them every assistance in our power by nursing them in their own homes; to organize in our Convent, meetings and sewing classes for the working class and

poor children and impart religious instructions to same, and assist said classes and children as best we can; to maintain a free circulating library and perform various other gratuitous works of charity and benevolence.

"Article (4): The officers of said corporation shall be a President, Secretary and a Treasurer, and such other officers as may be provided for, by its by-laws.

"Article (5): Said corporation shall enjoy all the privileges in respect to acquiring and holding property for the purposes of the corporation by gift, purchase, devise, or otherwise, as are made and provided for by the general and special statutes of the State of Missouri concerning corporations.

"Article (6): Said corporation shall make and adopt by-laws and rules for its government and support and the management of its property and affairs, and may provide for all things necessary and conducive to the good and successful management of the affairs of said Society. Some to be consistent with the laws of the United States and of Missouri, and with these Articles of Agreement.

"Article (7): These Articles of Agreement may be changed or amended at any regular or special meeting of the corporation by a two-thirds vote of those present, provided said Amendment has been in writing at a meeting of the corporation held at least one month previous to the meeting at which said amendment is adopted, and written notice of said proposed amendment has been given by mail or by personal service to each and every member of the corporation not present in person at said previous meeting when said proposed amendment was presented.

"Witness our hands and seals this 17th day of July, 1905.

Mary Heden George, (SEAL)
Known in Religion as Mary of the Redemption.

Mary Agatha Fitzgerald, (SEAL)
Known in Religion as Mary of St. Magdalene,

Margaret Agnes Chahlan, (SEAL)
Known in Religion as Mary St. Ethelreda,

Bridgett McDermott, (SEAL)
Known in Religion as Sr. of St. Gregory,

Lily Mary Fitzsimmons, (SEAL)
Known in Religion as Mary of Blessed Emanuel Alvares,

Margaret Pollet, (SEAL)
Known in Religion as Mary of St. Gaeton,

Maria Francois, (SEAL)
Known in Religion as Mary of the V. Joseph Anchista.

"STATE OF MISSOURI, } ss.
CITY OF ST. LOUIS. }

"On this 17th day of July, 1905, before me, a Notary Public within and for the city of St. Louis, personally appeared Mary Helen George, Mary Agatha Fitzgerald, Margaret Agnes Chahlan, Bridgett McDermott, Lily Mary Fitzsimmons, Margaret Pollet and Maria Francois, known in Religion as: Mary of the Redemption, Mary of St. Magdalene, Mary of St. Ethelreda, Mary of St. Gregory, Mary of the Blessed Emanuel Alvares, Mary of St. Gaeton, and Mary of Venerable Joseph Anchista respectively, to me known to be the persons described in and who executed the foregoing instrument and they severally acknowledged to me that they executed the same as their free act and deed, and for the purpose therein mentioned.

"WITNESS my hand and Notarial seal, this 17th day of July, 1905,

(SEAL). JOSEPH B. KREIKEMEIR,
Notary Public.

''STATE OF MISSOURI,  ⎱
                        ⎰ SS.
CITY OF ST. LOUIS,    ⎰

''IN THE CIRCUIT COURT, CITY OF ST. LOUIS, OCTOBER TERM, 1905.

"Thursday, October 19th, 1905.

''In the matter of        ⎫
        1875              ⎪
  The Society of the      ⎬
Helpers of the Holy Souls. ⎭

"And now at this day come Mary Helen George, as President, Lily Mary Fitzsimmons, as Secretary and Margaret Pollett, as Treasurer, of the Society of the Helpers of the Holy Souls, and submit to the court the articles of agreement of said association, together with a petition praying for a *pro forma* decree thereon, in manner provided by law, and it appearing to the court that said petition has remained on file in the clerk's office of the court at least three days since the same was first presented to the court, and the court having duly examined the articles of agreement, and being duly advised in the premises, doth now consider, adjudge and determine that such articles of agreement and the purpose of the association as therein expressed come properly within the purview of article XI, of chapter 12, of the Revised Statutes of the State of Missouri, 1899, entitled 'Benevolent, Religious, Scientific, Fraternal, Beneficial, Educational and miscellaneous associations,' and are not inconsistent with the Constitution or Laws of the United States or of the State of Missouri. It is therefore ordered and decreed that the prayer of the petition for a *pro forma* decree be and the same is hereby granted.''